IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MSW CAPITAL, LLC,                §
                                          §
           Plaintiff,                 §
                                          §
V.                                      §           No. 3:16-cv-3076-L
                                          §
AARON'S, INC. and TURTLE CREEK     §
ASSETS, LTD.,                §
                                          §
           Defendants.             §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Defendant Aaron's, Inc. ("Aaron's) filed a motion to dismiss, *see* Dkt. No. 9, which United States District Judge Sam A. Lindsay referred to the undersigned United States magistrate judge for findings and recommendation, *see* Dkt. No. 16. Plaintiff MSW Capital, LLC ("Plaintiff" or "MSW"), filed a response, *see* Dkt. No. 14, and Aaron's filed a reply, *see* Dkt. No. 17. The undersigned magistrate judge issues the following findings of fact, conclusions of law, and recommendation.

**Background**

In May 2012, Aaron's entered into an agreement with Defendant Turtle Creek Assets, Ltd. ("Turtle Creek") governing the recurring monthly sale of certain defaulted customer accounts to Turtle Creek. *See* Dkt. No. 1-1 (the "Aaron's/Turtle Creek Agreement"). Under the Aaron's/Turtle Creek Agreement, in each month's sale, Aaron's produced to Turtle Creek an account listing in an electronic format, which contained pertinent information for the accounts being sold, including customers' names, social

security numbers, addresses, telephone numbers, details of the accounts being sold,

such as the amount unpaid by the customer, and other similar account information

customary in the account sale industry. *See id.* §§ 1.1, 2.3; Annex § 8. The

Aaron's/Turtle Creek Agreement included two sections addressing additional

production of documents after the initial production with each month's sale:

> Seller [Aaron's] agrees and covenants with Buyer [Turtle Creek] that
> Seller will comply with its obligations in respect of the retrieval and
> transmittal of documentation related to the Accounts as set forth in this
> Agreement and will provide such additional documents (e.g. Seller's lease
> agreement or affidavit if the lease agreement is missing) as are available
> to Seller to support the Accounts as reasonably requested by Buyer.

Dkt. No. 1-1 § 5.1.

> Buyer understands that Seller will not have in its possession all
> documents in respect of the Accounts that may be desired or requested by
> Buyer and that the Contracts may not include all documents related to
> any given Account. Buyer acknowledges that Seller's failure to provide
> any document that is not included among the Contracts will not
> constitute a Breach on the part of Seller.

*Id.* § 8.16. The Aaron's/Turtle Creek Agreement was "for the sole benefit" of Aaron's

and Turtle Creek and granted rights only to Aaron's, Turtle Creek and "their

respective successors and permitted assigns." *Id.* § 8.13. The Aaron's/Turtle Creek

Agreement allowed Turtle Creek, at its election and discretion, to resell any of the

purchased customer accounts to third parties. *See id.* § 8.6.

Turtle Creek did so. In July 2015, Turtle Creek entered an agreement with

MSW governing a one-time sale of certain accounts Turtle Creek previously purchased

from Aaron's. *See* Dkt. No. 1-7 (the "Turtle Creek/MSW Agreement"). The Turtle

Creek/MSW Agreement required Turtle Creek to electronically provide to MSW an

account listing containing the same customary account information Aaron's previously

provided to Turtle Creek in the original account sales. *See id.* §§ 1.1, 2.3. It also

contained provisions concerning the additional production of documents:

> Seller [Turtle Creek] agrees and covenants with Buyer [MSW] that Seller
> will comply with its obligations in respect of the retrieval and transmittal
> of documentation related to the Accounts as set forth in this Agreement
> and will provide such additional documents (e.g. Seller's lease agreement
> or affidavit if the lease agreement is missing) as are available to Seller to
> support the Accounts as reasonably requested by Buyer, including
> requesting and pursuing relevant documents from Aaron's, the
> Originating Creditor and/or any other Person who is a prior owner of the
> Accounts.

Dkt. No. 1-7 § 5.1.

> Buyer understands that Seller will not have in its possession all
> documents in respect of the Accounts that may be desired or requested by
> Buyer and that the Contracts may not include all documents related to
> any given Account. Buyer acknowledges that Seller's failure to provide
> any document that is not included among the contracts will not constitute
> a Breach on the part of Seller.

*Id.* § 8.16. The Turtle Creek/MSW Agreement was for "the sole benefit of" Turtle Creek

and MSW and granted rights only to Turtle Creek, MSW and "their respective

successors and permitted assigns." *Id.* § 8.13. Under the Turtle Creek/MSW

Agreement, MSW assumed all risks associated with collection of the accounts:

> Buyer understands that an investment in the Accounts is speculative and
> involves a high degree of risk and that Buyer must be able to withstand,
> and could sustain, a total loss of Buyer's investment in the Accounts.
> Buyer assumes all risks as to the collectibility of the Accounts.

*Id.* § 8.16.

According to the allegations in MSW's complaint, which the Court takes as true

for the purpose of the motion to dismiss, during the summer and fall of 2015, a dispute

between Aaron's and Turtle Creek arose concerning whether Aaron's had an obligation

to sell further accounts to Turtle Creek. *See* Dkt. No. 1 at 5. In October 2015, Aaron's

sued Turtle Creek in the Northern District of Georgia for declaratory judgment that

Aaron's had discretion to sell or not to sell any defaulted consumer accounts to Turtle

Creek. *See id.* at 5-6. As leverage in the declaratory judgment, Aaron's refused to

provide any documentation or supporting affidavits for accounts as requested by

downstream buyers who bought accounts from Turtle Creek. *See id.* at 6. Aaron's and

Turtle Creek entered a confidential settlement of the declaratory judgment action in

May 2016. *See id.*

While the declaratory judgment action was pending, in October and November

2015, MSW requested documentation from Turtle Creek related to 778 accounts that

were originated by Aaron's, and, in turn, Turtle Creek requested the account

documentation from Aaron's. *See id.* Eight months later, and as part of the settlement

of the declaratory judgment action, Aaron's produced approximately 338 affidavits and

296 original customer contracts. Aaron's has not produced documents or affidavits

relating to the remaining 144 accounts or provided any explanation as to why it cannot

produce the remaining account documents. *See id.* at 6-7.

On May 24, 2016, MSW requested from Turtle Creek account documentation

regarding another 998 accounts, and Turtle Creek submitted MSW's request to

Aaron's. *See id.* at 7, Dkt. No. 1-8 (Ex. H). Despite repeated follow-up attempts, *see*

Dkt. No. 1-9 (Ex. I), and two demand letters, *see* Dkt. No. 1-10 (Ex. J), neither Turtle

Creek nor Aaron's produced the documents, *see* Dkt. No. 1 at 7.

MSW alleges that Aaron's willfully, intentionally, and maliciously refused to provide the required account documentation despite knowing that MSW, a downstream buyer, has suffered and will continue to suffer damages as a result of Aaron's actions. MSW further alleges that, without the account documents, it has been unable to pursue collection actions against 998 accounts that it purchased from Turtle Creek. Accordingly, MSW claims to have been deprived of its expected return from the purchase of the customer accounts and exposed to liability from consumers and regulators for potential violation of the Fair Debt Collections Act. *See id.* at 7-8.

MSW alleges "on information and belief" that: Aaron's has the original account documents or information sufficient to create an affidavit for all of the customer accounts it sold to Turtle Creek, *see id.* 4 ¶ 19; Aaron's had knowledge of and consented to Turtle Creek's sale of the Aaron's accounts to MSW, *see id.* ¶ 22; and Aaron's willfully, intentionally, and maliciously refused to provide the required account documentation despite knowing that a downstream buyer, such as MSW, has suffered, and will continue to suffer damages as a result of its actions, *see id.* at 7 ¶ 46.

MSW sued Turtle Creek for breach of contract and rescission and Aaron's for tortious interference with its business relationship with Turtle Creek. *See id.* at 8-10. MSW attached the Aaron's/Turtle Creek Agreement, *see* Dkt. No. 1-1, and the Turtle Creek/MSW Agreement, *see* Dkt. No. 1-7, to its Complaint.

In its Complaint, MSW alleges that Section 5.1 of the Aaron's/Turtle Creek

Agreement contractually requires Aaron's to "provide all documents related to the accounts" Turtle Creek purchased from Aaron's "to assist Turtle Creek in collecting on the accounts." Dkt. No. 1-1 at 3, ¶ 15. MSW also alleges that, as part of its due diligence prior to purchasing the accounts from Turtle Creek, it relied on a September 2010 Seller Survey, which is attached to the Complaint. *See id.* at 5-6, ¶¶ 23-24; Dkt. No. 1-5. In the Seller Survey, Aaron's represented that it had 100% of the "Statements of Accounts," *id.* at 6, that a "statement of account, including complete payment history will be included for all accounts contained in the sale file," and that, if documents are missing, affidavits can be provided, *id.* at 7.

In its tortious interference claim, MSW contends that Aaron's, a third party, intentionally interfered with the agreement between Turtle Creek and MSW by refusing – without any legal justification – to provide documents and/or affidavits necessary to collect on the accounts it purchased from Turtle Creek. MSW further claims that Aaron's knew that Turtle Creek sold thousands of customer accounts to MSW and that, without the account documentation, MSW would be unable to pursue collection efforts and recover funds from the accounts. MSW asserts that Aaron's willful and intentional failure to provide charged-off account documentation has directly caused injury to MSW because, without the documents, MSW is unable to pursue collection efforts on those accounts and is exposed to liability. *See* Dkt. No. 1 at 10.

Aaron's filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 10. Aaron's argues that "no set of facts exists under which Aaron's can be

liable for tortiously interfering with the Turtle Creek/MSW Agreement by failing to provide the paper documents [MSW] requested." *Id.* at 2. Aaron's asserts that "Plaintiff fails to state a claim against Aaron's for tortious interference because the Complaint's allegations do not create a plausible inference that Aaron's willfully and intentionally interfered with the Turtle Creek/MSW Agreement for three reasons: (1) Plaintiff makes no allegation that Aaron's willfully and intentionally induced Turtle Creek to breach the Turtle Creek/MSW Agreement; (2) the conduct alleged by Plaintiff as the basis for the tortious interference claim—failure to produce the paper account documents Plaintiff requested—does not constitute a breach under the express terms of the Turtle Creek/MSW Agreement; and (3) Plaintiff's implication that Aaron's purported conduct was wrongful and made with the awareness of the consequences to Plaintiff fails to establish willful and intentional interference by Aaron's." *Id.*

Aaron's also asserts that the Complaint sets forth no allegations to support the claim that Aaron's proximately caused any damages suffered by MSW and that MSW's conclusory allegations based on information and belief are insufficient under the *Iqbal* and *Twombly* standard.

As to damages, Aaron's asserts that, because MSW fails to state a claim for tortious interference and makes no other tort claims, it also fails to state a claim for punitive damages.

And Aaron's asserts that MSW fails to allege any statutory or contractual basis for an award of attorneys' fees, that MSW's allegations that it is entitled to attorney's fees based on the "Tort of Another" exception fails to state a claim because Texas has

not adopted the exception, and that, even if Texas law recognized the exception, MSW's allegations fail to show involvement in a prior litigation action with a third party.

Aaron's seeks dismissal with prejudice.

The undersigned now concludes that Aaron's motion to dismiss should be granted.

## Legal Standards

In deciding a Federal Rule of Civil Procedure 12(b)(6) motion, the Court must "accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205–06 (5th Cir. 2007). To state a claim upon which relief may be granted, Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

While, under Federal Rule of Civil Procedure 8(a)(2), a complaint need not contain detailed factual allegations, Plaintiffs must allege more than labels and conclusions, and, while a court must accept all of the Plaintiffs' allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id*. But, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, a plaintiff need only "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that Plaintiff contends entitle him or her to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. ____, 135 S. Ct. 346, 347 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)); *accord N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) ("To survive a Rule 12(b)(6) motion to dismiss, the complaint does not need detailed factual allegations, but it must provide the plaintiff's grounds for entitlement to relief – including factual allegations that, when assumed to be true, raise a right to relief above the speculative level." (footnote and internal quotation marks omitted)).

The United States "Supreme Court has made clear that a Rule 12(b)(6) motion turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (quoting *Johnson*, 135 S. Ct. at 347, and the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint

for imperfect statement of the legal theory supporting the claim asserted," *Johnson*, 135 S. Ct. at 346.

A court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Pleadings in the Rule 12(b)(6) context include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Documents "attache[d] to a motion to dismiss are considered to be part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). "Although the [United States Court of Appeals for the] Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011). "However, if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Id.*

## Analysis

As an initial matter, MSW asserts that, although the Turtle Creek/MSW Agreement is governed by Delaware law, *see* Dkt. No. 1 at 9-10, Texas state law applies

to the tortious interference claim. For purposes of the motion to dismiss, Aaron's assumes *arguendo* that Texas law applies to the tortious interference claim, but it reserves the right to challenge and object to the application of Texas law if the case is not dismissed. *See* Dkt. No. 10 at 8-9, n.2. The undersigned will therefore also analyze this tort claim under Texas law. *See Smith v. EMC Corp.,* 393 F.3d 590, 597 (5th Cir. 2004) ("A state's law specified by the choice-of-law clause [in a contract] is applied only to those claims pertaining to the instrument. All other claims are governed by the forum state's law.").

MSW contends that Aaron's tortiously interfered with its business relationship with Turtle Creek by interfering with the Turtle Creek/MSW Agreement. To recover for tortious interference with an existing business relationship by a third party, the plaintiff has the burden of proving the essential elements of tortious interference with a contract. *See Dunn v. Calahan*, No. 03-05-426-CV, 2008 WL 5264886, at *3 (Tex. App. – Austin Dec. 17, 2008, no pet.) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989)); *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

The elements of tortious interference with contract are (1) a contract subject to interference; (2) a willful and intentional act of interference; (3) that was a proximate cause of the plaintiff's damages; and (4) actual damage. *Cuba v. Pylant*, 814 F.3d 701, 717 (5th Cir. 2016) (citing *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). "'For a plaintiff to maintain a tortious interference claim, it must produce some

evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under a contract.'" *Id.* (quoting *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App. – Fort Worth 2009, pet. denied)). "Although it does not appear that an actual breach must occur, the defendant must have intended to induce a breach (even if unsuccessful), thereby making performance more difficult in some way that injured the plaintiff." *Id.*; *see generally  Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 421 (5th Cir. 2001) (explaining that the Fifth Circuit's "interpretation of Texas law is binding on the district court, unless a subsequent state court decision or statutory amendment renders [the Fifth Circuit's] prior decision clearly wrong").

MSW does not allege that Aaron's willfully and intentionally induced Turtle Creek to breach the Turtle Creek/MSW Agreement, which it must do to plead willful and intentional interference. *See Cuba*, 814 F.3d at 717; *see also Dunn*, 2008 WL 5264886, at \*3 ("The defendant must knowingly induce one of the contracting parties to breach its obligations under a contract.") (citing *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1992)). Nor can it. The Turtle Creek/MSW Agreement, attached to the complaint, expressly provides that the "failure to provide any document that is not included among the Contracts will not constitute a Breach on the part of" Turtle Creek. *See* Dkt. No. 1-1 at 17 ¶ 8.16.

MSW contends that "injury is proof of a breach of contract" and argues that it "need show only injury, not necessarily a breach of contract." Dkt. No. 14 at 16. This is contrary to well-established law. *See Cuba*, 814 at 717. To state a claim for tortious

interference, MSW must allege that Aaron's knowingly induced or intended to induce Turtle Creek to breach the Turtle Creek/MSW Agreement. *See id.* As Aaron's correctly asserts, "[e]ven taking as true Plaintiff's allegation that Aaron's somehow induced Defendant Turtle Creek to not produce the paper documents requested by Plaintiff, such conduct does not constitute a tortious-interference-with-contract claim because it was not an action to induce a breach under the Turtle Creek/MSW Agreement." Dkt. No. 10 at 7-8 (emphasis removed).

Further, Aaron's is correct that "Plaintiff's allegation that Aaron's purportedly was aware that Plaintiff's collection efforts would be affected still fails to establish willful and intentional interference by Aaron's." *Id.* at 8-9. Neither can MSW – particularly in the face of the language in the Aaron's/Turtle Creek Agreement disclaiming any third-party reliance or beneficiary – allege a tortious-interference claim based on allegations that Aaron's breached its contractual obligations to Turtle Creek under the Aaron's/Turtle Creek Agreement without any allegations that this did or could induce a breach of the Turtle Creek/MSW Agreement. *See Cuba*, 814 at 717.

And, as Aaron's asserts, even if MSW "is considered an 'assign' of the Aaron's/Turtle Creek Agreement, [MSW] still fails to state a claim for tortious interference [with the Aaron's/Turtle Creek Agreement] because Aaron's, as the purported tortfeasor, was not a 'stranger' to [that] contract." Dkt. 17 at 4 n.6; *accord Matter of Dallas Roadster, Ltd.*, 846 F.3d 112, 124 (5th Cir. 2017) (noting that a defendant "cannot tortiously interfere with its own contracts"); *Morgan Stanley & Co.*

*v. Texas Oil Co.*, 958 S.W.2d 178, 179 (Tex. 1997) (noting that "a person must be a stranger to a contract to tortiously interfere with it").

Alternatively, MSW focuses on the contract language, arguing that Turtle Creek breached the Turtle Creek/MSW Agreement by failing to provide requested documents that are "included among the Contracts." When a dispute arises from the terms of a contract and the contract is not ambiguous, the Court can determine the parties' rights and obligations under the agreement as a matter of law. *See ACS Inv'rs, Inc. v. McLaughlin*, 942 S.W.2d 426, 430 (Tex. 1997). Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference. *See id.* (citing *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1258 (5th Cir. 1985)). Moreover, a contracting party's preemptive rights are not triggered by the other contracting party's negotiations with a third-party purchaser. *See id.*

Even if the "included among the Contracts" language required Aaron's to produce the requested documents, there is no provision in the Turtle Creek/MSW Agreement providing that Turtle Creek would be in breach by unsuccessfully asking Aaron's for additional documents. Therefore, even crediting MSW's allegations and arguments, MSW cannot allege that Aaron's knowingly and intentionally induced Turtle Creek to breach – or intended to induce a breach of – the Turtle Creek/MSW Agreement, which MSW must do to state a claim for tortious interference with contract.

Accordingly, because MSW fails to plead sufficient facts to state that Aaron's

willfully and intentionally interfered with the Turtle Creek/MSW Agreement, MSW's tortious interference claim against Aaron's should be dismissed. And, because no amount of artful or creative pleading of facts will permit MSW to state claim for tortious interference based on Aaron's failure to produce documents, MSW's claim against Aaron's should be dismissed with prejudice along with the request for exemplary damages that depends on that claim. *See, e.g.*, *Seismic Wells, LLC v. Matthews*, No. 5:15-cv-148-C, 2015 WL 11027778, at \*5 (N.D. Tex. Sept. 11, 2015); *Collier v. Wells Fargo Home Mortg. as Successor in Interest to Norwest & Parker Square Bank*, No. 7:04-cv-086-K, 2006 WL 1464170, at \*11 (N.D. Tex. May 26, 2006).

Finally, MSW's response explains that, "[w]hile Texas law is unsettled as to whether or not a recovery of attorneys' fees may be permitted in a tortious interference case such as the one at issue, to streamline the case, MSW hereby voluntarily dismisses without prejudice its claim for attorneys' fees against Aaron's under Count VI." Dkt. No. 14 at 17 n.12.

## Recommendation

Defendant Aaron's, Inc.'s Motion to Dismiss Plaintiff's Complaint Against Defendant Aaron's, Inc. [Dkt. No. 9] should be granted.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or

recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

    DATED: April 20, 2017

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE